## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DAMON ADAMS,

      Plaintiff,

      v.

BOB CAMERON,
GERALD DONOVAN,
MARK GIANGIULIO and
ROD AND REEL, INC.,

      Defendants.

Civil Action No. TDC-20-3739

## MEMORANDUM OPINION

Plaintiff Damon Adams has filed this civil action against Defendants Bob Cameron, Gerald Donovan, Mark Giangiulio, and Rod and Reel, Inc., alleging violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 (2018), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); violations of several Maryland statutes relating to housing and employment; and related state common law claims. Pending before the Court is Defendants' Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Adams is a Black man formerly employed by Defendant Rod and Reel, Inc. ("RRI"), a restaurant and resort in Chesapeake Beach, Maryland. He worked for RRI from May 19, 2018 to

October 12, 2018.  RRI is owned by Defendant Gerald Donovan, who manages the business and approves all decisions about employment, including those relating to the allocation of and conditions within employee housing.

At some point during his employment, Adams began living in employee housing owned and operated by RRI.  Though Adams paid rent for the housing through deductions from his paycheck, he was not provided a copy of the lease, which included a provision allowing for his immediate eviction at RRI's discretion.  Adams was assigned to a residential property characterized by unsanitary conditions, including rat infestation, rat feces, rat urine, mold, and a chronically unusable bathroom in Adams's rental unit.  According to Adams, RRI restricted Black staff members living in employee housing to units at this substandard property.  Adams's employee housing also came with other restrictions, including a ban on overnight guests and smoking, to which non-Black staff in other employee housing properties were not subjected.

On October 12, 2018, Adams reported the unsanitary housing conditions to Defendant Bob Cameron, the RRI Human Relations Director, who allocated employee housing and had prepared Adams's lease.  Immediately thereafter, Defendant Mark Giangiulio, the General Manager of RRI, terminated Adams from his employment.  Only 20 minutes after the termination, Giangiulio directed off-duty police and security officers to approach Adams and threaten to remove him from the employee housing by force if he did not leave within 24 hours.  These officers returned on the morning of October 13, 2018 to ensure that Adams vacated the premises.  Adams's eviction and termination were approved by Donovan.

On April 26, 2019, Adams filed a Charge of Discrimination ("the Charge") with the Maryland Commission on Civil Rights, which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC") and the United States Department of Housing

and Urban Development. On September 3, 2019, the Maryland Commission on Civil Rights completed processing of the Charge.

On December 23, 2020, Adams filed the instant case against RRI, Cameron, Donovan, Giangiulio, and two other Defendants, Mary Donovan and Jeffrey Siebold. In the now operative Amended Complaint ("the Complaint") filed on May 28, 2021, Adams alleges ten different causes of action in the following numbered counts: (1) a breach of the warranty of habitability, Md. Code Ann., Real Prop. § 8–208 (LexisNexis 2015); (2) a retaliatory action for complaining of unsanitary housing conditions, Md. Code Ann., Real Prop. § 8–208.1; (3) a common law claim of wrongful discharge for complaining of unsanitary housing conditions; (4) unlawful eviction, Md. Code Ann., Real Prop. § 8–216; (5) a common law claim of intentional infliction of emotional distress; (6) race discrimination in housing, in violation of the FHA; (7) race discrimination relating to a contract, in violation of § 1981; (8) race discrimination in employment, in violation of Title VII; (9) race discrimination in employment, in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20–606 (LexisNexis 2021); and (10) housing discrimination in violation of state law, Md. Code Ann., State Gov't § 20–705. On September 13, 2021, Adams filed a Notice of Voluntary Dismissal of Defendants Mary Donovan and Siebold, which the Court approved.

## DISCUSSION

In their Motion, Defendants seek dismissal of Adams's Title VII claim for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and of all claims under Rule 12(b)(6) for failure to state a claim. Defendants' Rule 12(b)(1) argument is based on the claim that Adams failed to exhaust administrative remedies on his Title VII hostile work environment claim. The United States Supreme Court, however, has held that exhaustion of administrative

3

remedies for Title VII claims is not a jurisdictional requirement but is instead a claim-processing rule. *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1846 (2019). Accordingly, the Court will consider Defendants' Title VII exhaustion argument as asserted under Rule 12(b)(6).

## I.      Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.     Housing Claims

Adams asserts violations of several Maryland state laws relating to housing, including those providing causes of action for retaliatory action, unlawful eviction, and breach of the warranty of habitability, based on his allegation that he was summarily evicted in retaliation for complaining about the housing conditions in RRI employee housing. He also alleges race discrimination in the provision of employee housing, in violation of the FHA, § 1981, and the Maryland housing discrimination statute, Md. Code Ann., State Gov't § 20–705. The Court addresses Defendants' arguments for dismissal of each of these claims.

### A.      Retaliatory Action

Defendants seek dismissal of Adams's claim in Count 2 of a retaliatory housing action in violation of section 8–208.1 of the Real Property Article of the Maryland Code. This statute

provides that a landlord may not "[t]erminate a periodic tenancy" for an improper reason, including because "the tenant . . . has provided written or actual notice of a good faith complaint about an alleged violation of the lease, violation of law, or condition on the leased premises that is a substantial threat to the health or safety of occupants to . . . the landlord." Md. Code Ann., Real. Prop. § 8–208.1. Defendants argue that Adams has not specifically alleged that any particular Defendant was his landlord or that he provided the requisite notice to the landlord about an alleged violation of the lease, violation of law, or condition that is a substantial threat to the health or safety of occupants. While the Complaint does not explicitly call RRI the "landlord," it states that Adams lived in "RRI-owned" employee housing, that "RRI rental payments were deducted directly from [his] paycheck," and that "RRI refused to provide [him] with a copy of his lease." Am. Compl. ¶¶ 4, 5, 8, ECF No. 13.   Viewed together, these allegations support the inference that RRI was Adams's landlord at the time of his eviction.

Adams's Complaint also alleges unsanitary conditions that would pose a substantial threat to the health of occupants, including "rat infestation, rat feces, rat urine, mold infestation, and a chronically unusable bathroom," and states that Adams reported these "unsanitary conditions" to Cameron, who "received all of [Adams's] complaints . . . related to . . . inadequate employee housing." Am. Compl. ¶¶ 11, 24. Where Cameron, as Human Relations Director, was an agent of RRI, and Giangiulio, the General Manager and another agent of RRI, evicted Adams the same day that he provided notice of the unsanitary conditions, the Complaint states a plausible claim of a retaliatory action under the statute. The Motion will be denied as to Count 2.

### B.    Unlawful Eviction

Defendants' argument for dismissal of Count 4, unlawful eviction, fails for similar reasons. Under Maryland law, "a landlord may not take possession or threaten to take possession of a

dwelling unit from a tenant or tenant holding over by locking the tenant out or any other action, including willful diminution of services to the tenant." Md. Code Ann., Real Prop. § 8–216. Defendants move to dismiss Count 4 on the grounds that Adams has not alleged "that any of the named Defendants served as his landlord, threatened to take possession, or threatened to willfully diminish services provided to him." Mot. Dismiss at 10, ECF No. 14-1. As discussed above, Adams's allegations are sufficient to infer that RRI was his landlord. *See supra* part II.A. Adams has alleged that Giangiulio, the General Manager of RRI, "directed off-duty paid police officers and security officers to confront" Adams at his housing unit, and that they then "threatened to remove [him] . . . by force." Am. Compl. ¶ 14. The Complaint also states that Giangiulio "sent police officers to [Adams's] residence" to evict him "under threat of force." *Id.* ¶ 25. These allegations are sufficient to support the inference that the officers who threatened to evict Adams by force did so at the direction of Giangiulio, an agent of the landlord RRI, in violation of the unlawful eviction statute. The Motion will be denied as to Count 4.

## C.     Section 8–208 Claims

Count 1 of the Complaint, entitled "Breach of Warranty of Habitability," references the unsanitary conditions in Adams's housing unit and cites section 8–211 of the Real Property Article of the Maryland Code, which is entitled "Duty of landlords to repair or eliminate serious conditions and defects of residential dwelling units," and section 8–208 of the same, entitled, "Written lease requirements." Am. Compl. ¶ 7; Md. Code Ann., Real. Prop. §§ 8–208, 8–211. In his memorandum in opposition to the Motion ("Opposition"), however, Adams clarifies that he is not pursuing a claim under section 8–211, and that he invoked that section in the Complaint only "as a guideline for establishing habitability definitions relevant" to his claim that Defendants violated section 8–208(c)(1). Opp'n Mot. Dismiss at 3 n.1, 4-5, ECF No. 17. Section 8–208(c)(1) provides

6

that a written lease "shall include . . . [a] statement that the premises will be made available in a condition permitting habitation, with reasonable safety," or "a statement of the agreement concerning the condition of the premises." Md. Code Ann., Real Prop. § 8–208(c)(1). Adams, however, does not allege that the lease, in fact, lacked such a statement. The Motion will be granted as to any claim under Count 1 based on a violation of section 8–208(c)(1).

Count 1 also asserts violations of other lease requirements set forth in section 8–208. Specifically, Adams alleges that that Defendants "refused to provide [Adams] with a copy of his lease," in violation of section 8–208(b), and that Defendants "inserted provisions in his lease that provided for his immediate eviction at the discretion of RRI management," in violation of section 8–208(d). Am. Compl. ¶ 8.

Section 8–208(b) states that a "landlord who rents using a written lease shall provide, upon written request from any prospective applicant for a lease, a copy of the proposed form of lease in writing." Md. Code Ann., Real Prop. § 8–208(b). Defendants argue that Adams has failed to state a claim under this provision because he has not alleged that RRI served as his landlord, that Adams was a prospective applicant, or that he submitted a written request for a copy of the lease prior to residing there. In opposing the Motion, Adams claims only that he has alleged sufficient facts to support an inference that RRI was his landlord, not that he has alleged that he submitted a written request for his lease while a prospective applicant. Where the Complaint does not include operative facts necessary to support a violation of this provision, the Motion will be granted as to the claim under Count 1 based on a violation of section 8–208(b).

Section 8–208(d) provides, in relevant part, that a "landlord may not use a lease or form of lease containing any provision that . . . [h]as the tenant agree to a period required for landlord's notice to quit which is less than that provided by applicable law." Md. Code Ann., Real Prop. §

8–208(d)(5). Here, Adams has sufficiently alleged that RRI was his landlord, *see supra* part II.A., and that his lease violated section 8–208(d)(5) because it provided for "immediate eviction." Am. Compl. ¶ 8. Under Maryland law, a landlord is required to "provide written notice of the intent to terminate a tenancy," and such notice must be provided between one week and 90 days before termination, depending on the length of the lease. *See* Md. Code Ann., Real Prop. § 8–402(b), (c). The landlord must then file a complaint in state court in order to evict. *Id.* § 8–402(b). To the extent that there may be a basis to repossess a housing unit before the expiration of a lease, even under the most compelling circumstances, the landlord must give a minimum of 14 days' written notice and then file a complaint in state court to actually evict a tenant. *See id.* § 8–402.1(a)(1)(i). Thus, a lease permitting "immediate eviction" is contrary to the applicable state law. Although Defendants argue that Adams has not provided the specific lease language in the Complaint, his allegations are sufficient at the present stage, particularly where Adams has alleged that he was never provided a copy of the lease. The Court thus need not address Adams's additional arguments that he has stated a valid claim under other subsections of section 8–208(d). The Motion will be denied as to the claim in Count 1 of a violation of section 8–208(d).

### D.    Housing Discrimination

In Count 6, Adams alleges housing discrimination in violation of the FHA based on the claim that he and other Black employees provided with employee housing were allowed to live only in the substandard property and were not permitted to live in other housing properties with acceptable living conditions. Under the FHA, it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). An "FHA claim can proceed under either a disparate-treatment or

8

a disparate-impact theory of liability." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). "Under a disparate-treatment theory of liability, 'a plaintiff must establish that the defendant had a discriminatory intent or motive,' whereas 'a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale.'" *Id.* (quoting *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015)). Here, Adams is pursuing a disparate treatment theory of liability.

A plaintiff may prove a disparate treatment FHA violation by showing "that a defendant had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test" under which a plaintiff must first establish a *prima facie* case of discrimination. *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To state a *prima facie* case of discrimination under the FHA, Adams "must show that he is a member of a protected class and that he was treated differently than other tenants because of . . . membership in that class." *Roberson v. Graziano*, No. WDQ–09–3038, 2010 WL 2106466, at *2 (D. Md. May 21, 2010), *aff'd*, 411 F. App'x 583 (4th Cir. 2011). Here, the Complaint alleges that he was discriminated against by Defendants' "intentional policies," including restricting his choice of employee housing to a property that was "unsanitary and unfit for . . . habitation." Am. Compl. ¶ 20. The Complaint also alleges that non-Black staff who lived in employee housing were not similarly restricted. *Id.* These allegations that Black employees were excluded from certain housing units of higher quality, viewed in the light most favorable to Adams as is required at this stage, state a *prima facie* case of intentional discrimination in housing based on race. Although Adams has not identified a specific comparator from outside

the protected class who was treated differently, the universe of residents of RRI employee housing is limited to Adams's co-workers at a single business.  Accordingly, it is reasonable to infer that Adams has a more specific basis of knowledge informing his allegation of segregated housing than would be the case for a claim relating to housing open to the general public.  The Motion will be denied as to Count 6.

In Counts 7 and 10, Adams alleges that the same housing discrimination violates § 1981 and the Maryland housing discrimination statute.  While Defendants seek dismissal of these counts, they do not advance any arguments specific to these claims.  Rather, they state in a footnote that these claims should be analyzed under the same framework as the FHA claim in Count 6.  Mot. Dismiss at 18 n.3.  Where this Court has determined that the Motion will be denied as to Count 6, the Motion will be denied as to Counts 7 and 10 as well.

## III.   Employment Claims

Adams also alleges several claims relating to his employment with RRI.  First, he alleges that his termination constituted a wrongful discharge in violation of public policy under Maryland law because it was in retaliation for his complaints about the conditions in his employee housing. Second, he alleges that he was subjected to race discrimination in employment, in violation of Title VII and the MFEPA.

### A.   Wrongful Discharge

In Count 3, Adams alleges that his termination constituted a wrongful discharge in violation of Maryland law because it was in retaliation for reporting the unsanitary conditions in RRI employee housing.  In general, for at-will employment, "an employment contract is of indefinite duration, unless otherwise specified, and may be terminated legally at the pleasure of either party." *Porterfield v. Mascari II, Inc.*, 823 A.2d 590, 601-02 (Md. 2003).  However, under

Maryland law, the tort of wrongful discharge allows an at-will employee to assert a claim for abusive or wrongful discharge against the employer if the termination violated public policy. *Id.* at 602 (citing *Adler v. American Standard Corp.*, 432 A.2d 464, 467 (Md. 1981)). To succeed on such a claim, a plaintiff must establish that (1) the employee was discharged; (2) the alleged basis for discharge violated some clear mandate of public policy; and (3) there is a nexus between the employee's conduct and the decision to fire the employee. *Wholey v. Sears Roebuck*, 803 A.2d 482, 489 (Md. 2002). Where Adams has alleged that he was discharged because of his reporting of unsanitary housing conditions, he has satisfied the first and third elements. Defendants argue that Adams fails as to the second element in that he has not established a violation of a clear mandate of public policy.

For purposes of a wrongful discharge claim, a violation of a clear mandate of public policy can occur when "an employee has been fired for refusing to violate the law or the legal rights of a third party" or "where an employee has been terminated for exercising a specific legal right or duty." *King v. Marriott Int'l, Inc.*, 866 A.2d 895, 901 (Md. Ct. Spec. App. 2005). A public policy mandate ordinarily "must be reasonably discernible from statutory or constitutional mandates." *Id.* at 901-02. Here, Adams's identified public policy mandate is statutory: the retaliatory action provision of the Real Property Article of the Maryland Code, which prohibits landlords from retaliating against a tenant by terminating the tenancy because the tenant provided notice of a "good faith complaint" about a "condition on the leased premises that is a substantial threat to the health or safety of occupants." *See* Md. Code Ann., Real Prop. § 8–208.1. Adams argues that his termination occurred because he exercised his legal right to register a complaint about housing conditions and thus violated the public policy underlying this anti-retaliation provision. Defendants argue that this statute does not provide a basis for a wrongful discharge claim because

11

the underlying policy is "to protect tenants in residential properties against retaliation by landlords" and "has nothing to do with employment relationships." Mot. Dismiss at 10.

The Maryland Court of Appeals, however, has never required the source of a public policy mandate to be specific to employment or to encompass the precise relationship between the plaintiff and the defendant. For example, the Court of Appeals has found a public policy mandate arising from a Maryland criminal statute establishing that harming or injuring a person or property in retaliation for reporting a crime is a misdemeanor offense, such that an employee terminated for reporting criminal activity by a co-worker could assert a claim of wrongful discharge, even though the statute is unrelated to the employment relationship. *See Wholey*, 803 A.2d at 492-93; *see also Insignia Residential Corp. v. Ashton*, 755 A.2d 1080, 1087 (Md. 2000) (holding that a statute prohibiting prostitution and attempts to coerce individuals into prostitution "represents a clear mandate of public policy" that could underlie a claim of wrongful discharge for refusing to engage in conduct that would constitute prostitution, even though the statute itself is unrelated to employment). Where section 8–208.1 demonstrates a state public policy against retaliation for reporting unsanitary housing conditions, it may plausibly provide a basis for a wrongful discharge claim particularly where, as here, the plaintiff is both a tenant and employee of the landlord.

Defendants further argue that because section 8–208.1 already provides a remedy for violations of that statute, it cannot support a wrongful discharge claim. Wrongful discharge "will not lie if the statute provides a civil remedy that would render relief via a wrongful discharge action duplicative." *Porterfield*, 823 A.2d at 603. When a statute creates a right and remedy for enforcing an exception to at-will employment, the "generally accepted reason for recognizing [the tort of wrongful discharge], that of vindicating an otherwise civilly unremedied public policy violation, does not apply." *Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 190 (Md. 1989). In

12

*Makovi*, an employee brought claims of discriminatory termination based on sex under Title VII, the MFEPA, and the tort of wrongful discharge. *Id.* at 179-80. The Maryland Court of Appeals held that the employee could not bring a wrongful discharge claim because the employment statutes provided both a right to challenge and a remedy for her termination, and a wrongful discharge claim is "inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." *Id.* at 180, 190. However, the Maryland Court of Appeals has separately held that a wrongful discharge cause of action was available, based on the MFEPA's clear statement of public policy against sex discrimination in employment, to an employee who was subjected to a discriminatory termination but had no remedy under the MFEPA because her employer was in a category explicitly exempted from the MFEPA. *See Molesworth v. Brandon*, 672 A.2d 608, 613-14, 616 (Md. 1996).

Unlike the anti-discrimination statutes at issue in *Makovi* which provide a specific remedy for discriminatory terminations, section 8–208.1 provides a cause of action only for retaliatory actions against a tenant, such as termination of a tenancy, and does not provide a remedy for a retaliatory discharge from employment. Md. Code Ann., Real Prop. § 8–208.1(a), (b). Notably, the remedy in section 8–208.1 is limited to "damages not to exceed the equivalent of 3 months' rent, reasonable attorney fees, and court costs." *Id.* § 8–208.1(c)(1). Because the statute provides a cause of action for a retaliatory eviction but not for a wrongful termination from employment, it does not render a wrongful discharge claim "duplicative" and therefore does not preclude such a claim here. *See Porterfield*, 823 A.2d at 603. Because Adams has stated a plausible claim of a wrongful discharge in violation of public policy, the Motion will be denied as to Count 3.

13

### B.   Employment Discrimination

Defendants seek dismissal of the employment discrimination claims under Title VII and the MFEPA asserted in Counts 8 and 9, respectively. In support of these claims, Adams alleges that he was subject to "ongoing mistreatment, harassment, racial discrimination, and perquisite denial," which correspond to two actionable forms of employment discrimination: disparate treatment and a hostile work environment. Am. Compl. ¶ 20. Defendants argue that the hostile work environment claim must be dismissed because Adams failed to exhaust administrative remedies as to that claim, and that in any event he has failed to allege sufficient facts to support plausible claims of either disparate treatment or a hostile work environment. They also argue that Adams's MFEPA claim is barred by the applicable statute of limitations. "Title VII is the federal analog to [the MFEPA]" and guides interpretation of the MFEPA. *Town of Riverdale Park v. Ashkar*, 255 A.3d 140, 159 (Md. 2021); *see Passwaters v. Wicomico Cnty.*, 824 F. App'x 171, 171-72 n.* (4th Cir. 2020). Accordingly, the Court will analyze the merits of the Title VII and MFEPA claims together.

### 1.   Disparate Treatment

Adams's disparate treatment claim is based on his assertion that he and other Black employees of RRI were assigned to substandard housing as compared to non-Black employees utilizing RRI employee housing. Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a *prima facie* claim for race, color, or national origin discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory

job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.*, 375 F.3d 288, 295 (4th Cir. 2004).   A plaintiff need not allege each element of a *prima facie* case of disparate treatment to withstand dismissal if the allegations in the complaint support a plausible claim of discrimination. *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584-85 (4th Cir. 2015).

There is no dispute that Adams, who is Black, is a member of a protected class. Defendants argue that Adams has failed to allege the other three elements. Although Defendants contend that Adams has not alleged satisfactory job performance, Adams asserted in the Charge, which was included as an attachment to the Complaint, "My work performance was satisfactory and I had no disciplinary actions." Charge at 1, Am. Compl. Ex. 1, ECF No. 13. Where the Court may consider this Charge in evaluating the Complaint, this element is satisfied. *See E.I. du Pont de Nemours and Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (stating that "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint" at the motion to dismiss stage).

On the third element, "[a]n adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)).   Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).   The United States Court of Appeals for the Fourth Circuit has recognized that "the discriminatory denial of a non-contractual employment benefit" may constitute an adverse

employment action. *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 265-66, 267-68 (4th Cir. 2012) (holding that offering male employees whose positions were being eliminated better severance packages than similarly situated female employees could constitute an adverse employment action). The viability of such a claim "turns not on any contractual entitlement but on whether the benefit is 'part and parcel of the employment relationship.'" *Id.* at 267 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984)). Here, Adams has asserted that Defendants provided employee housing, but they had a policy of limiting Black staff to substandard, unsanitary employee housing while providing non-Black staff with higher quality employee housing. Adams has also stated that the rent for employee housing was deducted directly from his paycheck, thus reflecting that Defendants' provision of employee housing was intertwined with Adams's compensation and could be construed as an employment benefit that was "part and parcel of the employment relationship." *Gerner*, 674 F.3d at 267. Where Adams's allegations support an inference that Defendants provided employee housing as an employment benefit but provided housing with greater economic value to non-Black staff, these allegations sufficiently identify an adverse employment action.

As for the last element, the Court has already found, in relation to the FHA claim, that Adams has sufficiently alleged that similarly situated employees, specifically non-Black staff who lived in employee housing, received more favorable treatment than Adams. *See supra* Part II.D.

Because Adams has alleged sufficient facts to state a claim of disparate treatment under Title VII, the Motion will be denied as to Count 8.

### 2. Hostile Work Environment

Discrimination claims under Title VII are subject to an administrative exhaustion requirement. *See* 42 U.S.C. § 2000e-5(f)(1). One of the requirements for exhaustion is that a

plaintiff must include a claim in the EEOC charge, or the claim must be "reasonably related to [the] EEOC charge and can be expected to follow from a reasonable administrative investigation," in order to later assert it in federal court. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Though Defendants argue that Adams's Charge failed to assert a hostile work environment claim, the Court need not reach this issue because even if Adams properly asserted such a claim in the Charge, the Complaint fails to state a viable hostile work environment claim.

A hostile work environment based on harassment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the plaintiff's race, color, religion, national origin, age, or sex; (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). "Hostile environment claims are different in kind from discrete acts" in that their "very nature involves repeated conduct" such that the claim is "based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Here, the Complaint alleges that in addition to wrongfully terminating Adams for complaining about substandard housing conditions, Defendants discriminatorily restricted him from living in better employee housing and subjected him to "draconian" housing policies, including a ban on overnight guests and smoking, not applied to non-Black employees. Am. Compl. ¶ 20. The Complaint also generally alleges, without further detail, that Black employees were victims of "ongoing

17

mistreatment, harassment, racial discrimination, and perquisite denial." *Id.* While Adams argues in the Opposition that "his humiliation occurred on a daily basis at all times of the day," the Complaint does not identify any acts of possible racial harassment other than the allegedly discriminatory employee housing policies. Even considering the allegations in the Charge, in which Adams stated that Black staff were denied opportunities for customer service positions and were subjected to additional restrictions such as not being permitted to wear headphones, Adams has described discriminatory policies but has not identified acts of harassment that demonstrate the "discriminatory intimidation, ridicule, and insult" that characterize a hostile work environment claim, much less "severe or pervasive" harassment of this nature. *Boyer-Liberto*, 786 F.3d at 277; *see Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 (4th Cir. 2019) (holding that allegations that Black employees were denied certain benefits, received worse shift assignments, were questioned about overtime, had rules enforced against them more stringently, and were passed over for promotions "cannot reasonably be described as either frequent, physically threatening or humiliating" as required to establish severe or pervasive harassment for a hostile work environment claim). The Court therefore finds that Adams has not stated a plausible hostile work environment claim.

### 3.    Statute of Limitations

Defendants also argue that even if Adams has stated a valid employment discrimination claim, his MFEPA claim is time-barred. MFEPA claims are subject to a statute of limitations which provides that a "complainant may bring a civil action against [an employer] alleging an unlawful employment practice" if (1) "the complainant initially filed a timely administrative charge"; (2) "at least 180 days have elapsed since the filing of the administrative charge"; and (3) "the civil action is filed within 2 years after the alleged unlawful employment practice occurred,"

or "if the complaint is alleging harassment, the civil action is filed within 3 years after the alleged harassment occurred." Md. Code Ann., State Gov't § 20–1013(a). Here, Adams asserts, and Defendants do not contest, that Adams filed his Charge in a timely manner and that at least 180 days have since elapsed. However, the events described in the Complaint took place between May 19, 2018 and October 12, 2018, more than two years before the instant case was filed on December 23, 2020. Thus, any MFEPA claim other than a harassment claim is time-barred. *See* Md. Code Ann., State Gov't § 20–1013(a)(3). Although Adams argues that his MFEPA claim is timely because he alleged a harassment claim, which is subject to a three-year statute of limitations, the Court has already found that Adams has failed to state a plausible hostile work environment or harassment claim. *See supra* part III.B.2. The Court therefore finds that the remaining MFEPA claim, for disparate treatment, is time-barred. The Motion will be granted as to Count 9.

## IV.    Intentional Infliction of Emotional Distress

Defendants also seek dismissal of Count 5, Adams's common law claim of intentional infliction of emotional distress ("IIED") arising from his treatment by Defendants, on the grounds that the allegations do not support a plausible IIED claim. An IIED claim has four elements: "(1) [t]he conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) the emotional distress must be severe." *Manikhi v. Mass Transit*, 758 A.2d 95, 113 (Md. 2000) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). The Maryland Court of Appeals has cautioned that the "tort of intentional infliction of emotional distress is rarely viable, and is 'to be used sparingly.'" *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. 1995) (quoting *Ky. Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8, 11 (Md. 1992)).

Here, Adams fails to allege sufficient facts supporting the second and fourth elements. As to the second element, a defendant is liable for IIED only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977) (quoting Restatement (Second) of Torts § 46 cmt. d (Am. Law Inst. 1965)). While wrongfully and abruptly terminating and evicting an employee through the use of threats of forcible removal would undoubtedly cause significant distress, Defendants' alleged conduct does not clear the high bar that Maryland courts have set for the outrageous conduct required for an IIED.

Even if this Court were to find that Defendants' alleged actions meet the standard for extreme and outrageous conduct, the claim would still fail because the allegations do not support the fourth element of severe emotional distress. A plaintiff must show "a *severely* disabling emotional response to the defendant's conduct." *Harris*, 380 A.2d at 616. Emotional distress must be "so severe that no reasonable [person] could be expected to endure it." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. j). To meet this requirement, a plaintiff must "state with reasonable certainty the nature, intensity or duration of the alleged emotional injury." *Manikhi*, 758 A.2d at 115. Adams's sole allegation on this element is that he suffered "extreme emotional distress." Am. Compl. ¶ 26. This general description is insufficient. *See Manikhi*, 758 A.2d at 114-15 (affirming the dismissal of an IIED claim where the plaintiff alleged that she was forced to seek medical treatment without more particular information such as "whether the medical treatment that she was forced to seek was of a psychological or physical nature, how long the treatment lasted, whether it was successful or is still continuing, whether it was periodic or intensive, and so forth").

Because the Complaint does not sufficiently allege an IIED claim, the Motion will be granted as to Count 5.

## V.   Individual Defendants

Finally, Defendants argue that regardless of what claims may exist against RRI, all claims against Defendants Cameron, Donovan, and Giangiulio (collectively, "the Individual Defendants") must be dismissed. They assert that (1) the Title VII and § 1981 claims against the Individual Defendants must be dismissed because they are not subject to liability under those statutes; and (2) for all claims, the Complaint does not state which Individual Defendants are liable for which claim and fails to attribute specific conduct to each of them.

As an initial matter, the Court agrees with Defendants that the remaining Title VII claim in Count 8 must be dismissed as to the Individual Defendants. Title VII creates a cause of action against employers, not individual supervisors. *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180-81 (4th Cir. 1998). Individuals are thus not subject to suit under Title VII unless they themselves qualify as an "employer" under the statute. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999). Adams does not claim that Cameron, Donovan, or Giangiulio are themselves employers under Title VII. The Motion will therefore be granted as to the claims against the Individual Defendants in Count 8. However, there is no such categorical bar to § 1981 claims against individuals. For such claims, individual liability is permitted so long as a plaintiff demonstrates "some affirmative link to causally connect the actor with the discriminatory action" and the claim is "predicated on the actor's personal involvement." *Hawthorne v. Va. State Univ.*, 568 F. App'x 203, 204-05 (4th Cir. 2014) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)).

21

The remaining claims consist of the housing claims under the FHA, § 1981, and state law, and the wrongful discharge claim under Maryland law based on the allegedly retaliatory eviction. As to these claims, the Complaint provides several allegations specifying the role of each Individual Defendant. The Complaint alleges that Cameron, the RRI Human Relations Director, "prepared the leasing agreement," "received all of [Adams's] complaints . . . related to . . . inadequate employee housing at the resort and refused to act on these complaints"—which would include the complaint that led to his eviction and termination on the same day—and was an "on-site manager[]" who was "responsible for implementing the RRI discriminatory allegation of employment housing." Am. Compl. ¶ 24. The Complaint alleges that Giangiulio, the RRI General Manager, was another "on-site manager[]" who was "responsible for implementing the . . . discriminatory allocation of employment housing," that he "made the decision to wrongfully terminate" Adams, and that he "sent police officers . . . to evict [him] under threat of force." *Id.* ¶¶ 24-25. As for Donovan, the owner of RRI, the Complaint alleges that he "approve[d] all material decisions about employment conditions and housing conditions," that he "orchestrated the discriminatory allocation of employee housing," and that he "approved the unlawful eviction" of Adams and "his wrongful termination." *Id.* ¶ 23.

Adams has therefore alleged the personal involvement of each Individual Defendant in the alleged housing discrimination underlying the FHA, § 1981, and state law housing discrimination claims, as well as in the retaliatory termination and immediate eviction underlying the retaliatory action, unlawful eviction, wrongful discharge, and remaining section 8–208 claims. Accordingly, the Court finds that Adams has pleaded sufficient facts to preclude dismissal of the remaining claims against the Individual Defendants at this stage of the case.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to (1) any claims in Count 1 under Md. Code Ann., Real Prop. §§ 8-208(b), 8-208(c)(1), or 8-211; (2) the IIED claim in Count 5; (3) the Title VII claims against the Individual Defendants in Count 8; and (4) the MFEPA claims in Count 9. The Motion is otherwise denied. A separate Order shall issue.

Date: November 12, 2021

THEODORE D. CHUANG
United States District Judge

23